# In the United States Court of Federal Claims

BID PROTEST

No. 18-1559C

(Filed Under Seal: March 19, 2019 | Reissued: March 29, 2019)[*]

|  |  |
|---|---|
| KSC BOSS ALLIANCE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant, <br><br> and <br><br> PAE-SGT PARTNERS, LLC, <br><br> Defendant-Intervenor. | Keywords: Pre-Award Bid Protest; 28 U.S.C. § 1491; Exclusion from the Competitive Range; FAR 15.306; Judgment on the Administrative Record; NASA. |

*Aron C. Beezley*, Bradley Arant Boult Cummings LLP, Washington, DC, for Plaintiff. *Patrick R. Quigley* and *Sarah S. Osborne*, Bradley Arant Boult Cummings LLP, Washington, DC, Of Counsel.

*Elizabeth Anne Speck*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General. *Brian M. Stanford*, Senior Attorney, and *Lisette S. Washington*, Attorney, NASA Headquarters, Office of the General Counsel, Washington, DC, Of Counsel.

*Anuj Vohra*, Crowell & Moring LLP, Washington, DC, for Defendant-Intervenor. *James G. Peyster*, *Olivia L. Lynch*, *Michelle D. Coleman*, *Sarah A. Hill*, and *Payal P. Nanavati*, Crowell & Moring LLP, Washington, DC, Of Counsel.

---

[*] This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The opinion is now reissued with redactions of three offerors' names denoted as references to Offeror A, Offeror B, and Offeror C.

<u>**OPINION AND ORDER**</u>

**KAPLAN, Judge.**

In this pre-award bid protest, Plaintiff KSC Boss Alliance, LLC ("KBA") challenges as arbitrary and capricious NASA's decision to exclude it from the competitive range in a procurement for "baseport operations and spaceport services" at John F. Kennedy Space Center in Cape Canaveral, Florida.[1] Currently before the Court are cross-motions for judgment on the administrative record filed by KBA on the one hand, and the government and Defendant-Intervenor PAE-SGT Partners, LLC ("PSP"), on the other.

For the reasons discussed below, the Court finds that KBA's arguments lack merit. KBA's motion is therefore **DENIED** and the government and PSP's cross-motions are **GRANTED**.

**BACKGROUND**

**I.     The Solicitation**

NASA issued Solicitation NNK18619079R ("the Solicitation") on November 1, 2017. AR Tab 15 at 13589. The Solicitation requested proposals for the Kennedy Space Center Base Operations and Spaceport Services Contract ("the BOSS Contract"). <u>Id.</u> at 13582, 13589. Under the BOSS Contract, the contractor would provide "mission-focused institutional support at the John F. Kennedy Space Center and NASA facilities on Cape Canaveral Air Force Station." <u>Id.</u> at 13720. Specifically, the BOSS contractor's duties would include managing infrastructure and utilities at Kennedy Space Center as well as coordinating the use of various facilities by several institutional spaceport "users" including NASA, the Air Force, private entities, and other contractors. <u>See generally</u> AR Tab 15 at 13743–803; <u>see id.</u> at 13720 (describing support services as including "operations, maintenance, and engineering (OM&E) of assigned facilities, systems, equipment, and utilities (FSEU); work management and Spaceport integration functions; mission support and launch readiness management; project management and design engineering services; construction support services; and institutional logistics"); <u>id.</u> at 13906 (list of OM&E organizational users); AR Tab 38 at 27797 (list of baseline customers). The Solicitation defined the period of performance as an initial two-year base period followed by three two-year option periods. AR Tab 15 at 13604.

The Solicitation contemplated a "single award, fixed-price contract with a cost-reimbursable Contract Line Item Number ('CLIN') and a fixed-price Indefinite Delivery Indefinite Quantity ('IDIQ') component." AR Tab 58a at 28303. The cost-reimbursable CLIN applied to the "baseline work" set forth in the Performance Work Statement ("PWS"). That baseline work included:

---

[1] KBA is a joint venture of Kellogg Brown and Root Services, Inc. ("KBR") and Yang Enterprises, Inc. ("YEI"). Redacted Compl. ¶ 1, ECF No. 22. YEI is a subcontractor on the incumbent contract. AR Tab 38 at 27893.

responding to Service Orders (SOs) and Baseline Repairs and Replacements (BRRs); accomplishing recurring services such as Preventive Maintenance (PM), Programmed Maintenance (PGM), and Predictive Testing and Inspection (PT&I) that involve routine, periodic maintenance, and incidental repair requirements associated with assigned FSEU [i.e., facilities, systems, equipment and utilities]; operations that require continuous presence of qualified personnel during a specified period; work management and Spaceport integration; logistics; system engineering and engineering services; and project management services.

AR Tab 15 at 13720–21. The IDIQ component would include "work which cannot be adequately defined in advance for inclusion with baseline work." Id. at 13721.

## II.    The Solicitation's Source Selection Procedures and Evaluation Factors

### A.    Source Selection Procedures

Under the Solicitation, the award would be made to the responsible offeror whose proposal represented the best value to the government. Id. at 13686. The Solicitation specified that the BOSS procurement would use competitive negotiated acquisition procedures pursuant to FAR 15.3 and NASA FAR Supplement ("NFS") 1815.3 and that NASA would also use the tradeoff process described in FAR 15.101-1. Id. at 13707.

The Solicitation warned prospective offerors that their "initial proposal[s] should contain [their] best terms from a cost or price and technical standpoint," and indicated that NASA did not intend to hold discussions. Id. at 13686. Nonetheless, NASA reserved the right to conduct discussions if the contracting officer "later determine[d] them to be necessary." Id. Moreover, in the event discussions were held—which would require the agency to establish a competitive range pursuant to FAR 15.306(c)—the contracting officer could "limit the number of proposals in the competitive range to the greatest number that [would] permit an efficient competition among the most highly rated proposals." Id.

NASA's Source Evaluation Board ("SEB") would conduct evaluations of the proposals pursuant to NFS 1815.370. Id. at 13707. The SEB was comprised of five voting members, six nonvoting members (including the contracting officer, Kelly J. Boos), six evaluators, several consultants, and five ex officio members. AR Tab 11 at 13528–29.

### B.    Evaluation Factors

As set forth in the Solicitation and in accordance with NFS 1815.304-70, the SEB would evaluate proposals based on three factors: (1) Mission Suitability; (2) Past Performance; and (3) Price. AR Tab 15 at 13707. The Price factor was more important than the Mission Suitability factor, which was more important than the Past Performance factor. Id. The Mission Suitability and Past Performance factors, "when combined, [were] approximately equal to the Price factor." Id. The Solicitation stated that unless it was not in NASA's best interest, it would evaluate price based on the total price for all options plus the total price for the base period. Id. at 13708.

1.        **Mission Suitability**

The Mission Suitability factor was comprised of three subfactors: (1) Management Approach; (2) Technical Approach; and (3) Small Business Utilization. Id. at 13708. The subfactors would be individually evaluated, numerically scored, and weighted "using the adjectival rating, definitions, and percentile ranges at NFS 1815.305(a)(3)(A)." Id. Those ratings, definitions, and percentile ranges are represented in the chart below:

| ADJECTIVAL RATING | PERCENTILE RANGE | DEFINITIONS |
|---|---|---|
| **Excellent** | 91-100 | A comprehensive and thorough proposal of exceptional merit with one or more significant strengths. No deficiency or significant weakness exists. |
| **Very Good** | 71-90 | A proposal having no deficiency and which demonstrates over-all competence. One or more significant strengths have been found, and strengths outbalance any weaknesses that exist. |
| **Good** | 51-70 | A proposal having no deficiency and which shows a reasonably sound response. There may be strengths or weaknesses, or both. As a whole, weaknesses not offset by strengths do not significantly detract from the Offeror's response. |
| **Fair** | 31-50 | A proposal having no deficiency and which has one or more weaknesses. Weaknesses outbalance any strengths. |
| **Poor** | 0-30 | A proposal that has one or more deficiencies or significant weaknesses that demonstrate a lack of overall competence or would require a major proposal revision to correct. |

AR Tab 38 at 27802; see also NFS 1815.305(a)(3)(A). Offerors could earn up to 1,000 points as part of the Mission Suitability evaluation—525 points for Management Approach, 375 points for Technical Approach, and 100 points for Small Business Utilization. AR Tab 15 at 13708.

As explained by the government, under the Solicitation's evaluation procedures, the percentile scores assigned to each subfactor would be multiplied by the points assigned to arrive at the total for each subfactor. See Def.'s Cross-Mot. for J. on the Admin. R. & Resp. to Pl.'s Mot. for J. on the Admin. R. ("Def.'s Mot.") at 4–5, ECF No. 36 (citing AR Tab 58c.6 at 28508). "For example, a score of 91 for the Management Approach [subfactor], would be multiplied as a percentage of 525 available points (.91 x 525 = 477.75 points)." Id.

2.        **Past Performance**

The Solicitation provided that, consistent with FAR 15.305(a)(2) and NFS 1815.305(a)(2), NASA would "evaluate [offerors'] and proposed major subcontractors' recent performance of work similar in size, content, and complexity to the requirements of [the Solicitation]." AR Tab 15 at 13711. Based upon that evaluation, NASA would then assign confidence ratings as provided in NFS 1815.305(a)(2): Very High, High, Moderate, Low, Very Low, or Neutral. Id.; see also NFS 1815.305(a)(2). The Solicitation did not contemplate that incumbent contractors or subcontractors on the predecessor contract would receive any particular advantage when evaluating the Past Performance factor.

### 3.        Price

Price—the most important factor—was to be evaluated in accordance with FAR Subpart 15.4. The Solicitation stated that NASA would perform a price analysis consistent with FAR 15.404-1(b). Id. NASA reserved the right to reject a proposal with unbalanced pricing. Id. at 13686. The Solicitation did not require NASA to conduct a price realism analysis.

## III.    The SEB's Evaluation and the Competitive Range Determination

The Solicitation required that all proposals be fully submitted by December 29, 2017. Id. at 13583. KBA and four other offerors submitted timely proposals. AR Tab 58a at 28308.[2] Those proposals were then reviewed by the SEB in accordance with the evaluation scheme described above.

On April 11, 2018, the SEB presented the results of its initial evaluation to the Source Selection Authority ("SSA"). AR Tab 38 at 27787. The presentation summarized the evaluation factors as well as the ratings and scores achieved by the offerors. Id. at 27798–803. The SEB also detailed the strengths and weaknesses assigned to each offeror as part of the Mission Suitability evaluation and the reasons for those findings. Id. at 27804–40. The presentation further explained the reasoning for the "Very High" confidence rating assigned for each offeror's past performance and provided a summary of the total evaluated price of all offerors. Id. at 27841–51.

In the "Final Summary" section of its presentation, the SEB provided a chart detailing the offerors' Mission Suitability adjectival ratings and scores, their Past Performance ratings, and their total evaluated prices:

| | Mission Suitability Total Points: 1000 | | | | | | | Past Performance | Price |
| | Management 525 Points | | Technical 375 Points | | Small Business 100 Points | | Total | | |
| Offeror | Adjectival | Points | Adjectival | Points | Adjectival | Points | | | |
| A | Good | 357 | Very Good | 323 | Very Good | 85 | 765 | Very High | $670.0M |
| B | Good | 310 | Very Good | 304 | Good | 70 | 684 | Very High | $487.3M* |
| PSP | Good | 362 | Good | 218 | Very Good | 82 | 662 | Very High | $446.9M |
| KBA | Fair | 194 | Fair | 150 | Very Good | 87 | 431 | Very High | $658.3M |
| C | Fair | 215 | Fair | 120 | Very Good | 83 | 418 | Very High | $488.0M |

Id. at 27853.

---

[2] The other offerors were Offeror A, Offeror B, PSP, and Offeror C. AR Tab 38 at 27790.

The contracting officer decided during the evaluation process that discussions should be held. Accordingly, FAR 15.306 (c) required the establishment of a competitive range composed of the most highly rated proposals. AR Tab 39 at 27913. The SEB "recommended that the Government hold discussions with Offeror A, Offeror B, and PSP, which the SEB determined to be the most highly rated proposals" pursuant to FAR 15.306(c). Id. at 27913–14.

On April 12, 2018, the contracting officer prepared a five-page memorandum explaining the rationale for her competitive range determination. See generally id. She summarized the performance of each offeror's proposal in a chart reflecting the SEB's evaluation, as follows:

| Offeror | Mission Suitability Score | Past Performance Level of Confidence | Price |
|---|---|---|---|
| Competitive Range | | | |
| A | 765 | Very High | $670.0M |
| B | 684 | Very High | $487.3M* |
| PSP | 662 | Very High | $446.9M |
| Offerors Failing to Make the Competitive Range | | | |
| KBA | 431 | Very High | $658.3M |
| C | 418 | Very High | $488.0M |

*Potential mistake in Indefinite Delivery/Indefinite Quantity coefficient

Id. at 27915.

In her memorandum, the contracting officer provided an overview of the ratings assigned to each offeror and an explanation of her competitive range determination. She observed that Offeror A had the highest Mission Suitability score but that it also had the highest price. Id. at 27915–16. Offeror B had the second highest Mission Suitability score, but discussions were needed to determine whether its proposed price was accurate. Id. at 27916. PSP had the third highest Mission Suitability score and the lowest price. Id. The contracting officer opined that "[d]iscussions would likely enhance all three proposals, thereby increasing competition, which maximizes the Government's ability to obtain the best value." Id. Although the prices offered by Offeror B and PSP might increase if their proposals were revised, she observed, their proposals, along with that of Offeror A, "represent[ed] the most highly rated after initial evaluation." Id. She found this conclusion supported by the existence of a significant gap between the Mission Suitability scores of the top three proposals and those of Offeror C and KBA. Id.

The memorandum also included a discussion of the ratings assigned to KBA's proposal and an explanation for its exclusion from the competitive range. The contracting officer observed that KBA's Mission Suitability score "was the second lowest of the five proposals." Id. at 27916. She noted that "KBA was not among the most highly rated proposals when considering the evaluation results of all factors." Id. In particular, and as described below, she explained that the SEB had "identified several Basis of Estimate areas that demonstrated a lack of understanding in various resource areas." Id. In addition, and as also explained below, she noted that the SEB had concluded that KBA's "approach to managing the established counts" was "inappropriate." Id.

The contracting officer determined that it would not be worthwhile to engage in discussions with KBA to address the weaknesses in its proposal. She opined that "[e]ven if KBA

were to correct these weaknesses as a result of discussions, without any strengths or significant strengths in the Management and Technical subfactors, it is highly unlikely that discussions would result in KBA substantially increasing its Mission Suitability score without significant proposal revisions." Id. And, the contracting officer observed, KBA's evaluated price of $658.3 million was the second highest evaluated price, which the contracting officer concluded made the possibility of any tradeoff unlikely. Id.

## IV.    KBA's GAO Protest

On April 16, 2018, NASA notified KBA that its proposal was not among the most highly rated proposals and was not included in the competitive range. See generally AR Tab 40; see also AR Tab 51 at 28049. KBA requested a pre-award debriefing on April 18, 2018. AR Tab 51 at 28049; AR Tab 54 at 28093. NASA debriefed KBA on April 25, 2018. AR Tab 54 at 28093.

On May 4, 2018, KBA filed a protest with GAO. AR Tab 55. Relying upon GAO's decision in Pinnacle Solutions, Inc., B-414360, 2017 CPD ¶ 172 (Comp. Gen. May 19, 2017) ("Pinnacle"), KBA contended that NASA's competitive range determination was arbitrary and capricious because the contracting officer, according to KBA, "did not look behind the scores or adjectival ratings," and because "the competitive range determination did not document a reasoned consideration of the actual evaluation findings." See id. at 28142; see also id. at 28145 n.7, 28146 (citing Pinnacle in support of argument that the agency failed to meaningfully consider price).

GAO denied the protest on July 27, 2018. AR Tab 71 at 60112. It concluded that NASA's "underlying evaluation of KBA's proposal was reasonable and in accordance with the stated evaluation criteria." Id. at 60125. It also rejected KBA's argument that the contracting officer made the competitive range determination "solely on the basis of point scores or rating." Id. "[R]ather," GAO concluded, she "was fully aware of and compared the proposals against one another on a qualitative basis for each evaluation criteria." Id. The contracting officer did not "overemphasize the significant weaknesses and weaknesses assigned to KBA's proposal," GAO explained. Id. at 60125 n.14. Instead, she merely "noted these as [part of the] rationale as to why the proposal was not among the most highly rated." Id. In sum, GAO concluded that the competitive range determination "was reasonable" and "within the agency's discretion." Id. at 60124.

## V.    This Action

On August 6, 2018, ten days after GAO rejected KBA's protest, NASA awarded the BOSS contract to PSP, Defendant-Intervenor herein. Press Release, Nat'l Aeronautics & Space Admin., NASA Awards Base Operations, Spaceport Services Contract at Kennedy Space Center (Aug. 6, 2018), available at https://www.nasa.gov/press-release/nasa-awards-base-operations-spaceport-services-contract-at-kennedy-space-center. Two months later, on October 9, 2018, KBA filed the present protest. Compl., ECF No. 1.

In its pleadings, KBA challenges NASA's competitive range determination on several grounds. First, it contends that NASA relied too heavily on the adjectival ratings and point scores assigned to the proposals and that it failed to adequately document the reasons for its competitive

range determination. KBA also contends that the point scores themselves were distorted and arbitrary, id. ¶¶ 18–31, and, further, that NASA's determination does not document a meaningful consideration of price, id. ¶¶ 32–38. Finally, KBA alleges that several of the weaknesses that NASA assigned to the proposal under the Management Approach and Technical Approach subfactors were unjustified. Id. ¶¶ 39–63.

On October 10, 2018, contract awardee PSP filed a motion to intervene. ECF No. 15. The Court granted the motion the next day. ECF No. 16. KBA filed its motion for judgment on the administrative record on November 6, 2018 (ECF No. 31), and cross-motions from the government (ECF No. 36) and PSP (ECF No. 35) followed. The cross-motions have been fully briefed. Oral argument was held on February 27, 2019.

## DISCUSSION

### I.    Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In a pre-award protest, to possess the direct economic interest necessary for standing, a protester must have suffered a non-trivial competitive injury that can be addressed by judicial relief. See Weeks Marine, Inc., 575 F.3d at 1361–62. Even more specifically, in a pre-award, post-evaluation protest, the protester meets this standard if, absent the alleged errors, it would have a "substantial chance" of receiving the award; that is, if the protester "could have likely competed for the contract" but for the alleged errors. Orion Tech., 704 F.3d at 1348–49. The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis

Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)).

KBA, an actual offeror, challenges its exclusion from the competitive range, a procurement decision falling within the Court's "broad grant of jurisdiction over objections to the procurement process." Sys. Application & Techs., Inc., 691 F.3d at 1381. Moreover, KBA has sufficiently alleged a direct economic interest in the procurement. Taking the allegations of error to be true—as it must to determine standing—the Court finds that KBA "could likely have competed for the contract" in the absence of the alleged errors, because it would likely have proceeded to the competitive range stage and engaged in discussions. Accordingly, KBA is an interested party and the Court has subject-matter jurisdiction over its claims.

## II.    Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.    Scope of Review of Procurement Decisions

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). As a result, where an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). The Court's function is therefore limited to "determin[ing] whether 'the contracting agency provided a coherent and

reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action").

The scope of judicial review of competitive range determinations is particularly narrow. Thus, "a contracting officer has broad discretion in determining competitive range, and such decisions are not disturbed unless clearly unreasonable." Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970, 973 (Fed. Cir. 1993); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 44 Fed. Cl. 540, 554–55 (1999), aff'd in relevant part, 238 F.3d 1324, 1340 (Fed. Cir. 2001); Rivada Mercury, LLC v. United States, 131 Fed. Cl. 663, 677 (2017).

In short, a disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1338. For the agency to prevail, it need only articulate "a rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quotations omitted).

In this case, KBA's challenges to its exclusion from the competitive range in the BOSS procurement fall into two general categories. First, it claims that NASA's decisions to assign its proposals certain weaknesses under the Management and Technical subfactors of the Mission Suitability factor were arbitrary and capricious. Second, it challenges the competitive range determination itself, alleging: 1) that it was inadequately documented; 2) that it placed excessive reliance on adjectival ratings and point scores (which were "distorted and arbitrary"); and 3) that the determination does not reflect a meaningful consideration of relevant factors, including price. Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R. ("Pl.'s Mem.") at 7, ECF No. 31-1.

For the reasons set forth below, each of KBA's protest grounds lacks merit. KBA has not met its "heavy burden" of showing that its exclusion from the competitive range lacked a rational basis. Therefore, its motion for judgment on the administrative record must be denied and the government and PSP's motions granted.

## IV.   KBA's Challenges to the Assignment of Weaknesses to Its Proposal

The SEB assigned KBA's proposal two weaknesses under the Management Approach subfactor (one of them at the "significant" level). It assigned five weaknesses under the Technical Approach subfactor (one of which was at the "significant" level). KBA now contends that several of these evaluation decisions were arbitrary and capricious because they were based on a misreading or misunderstanding of the relevant elements of KBA's proposal.

It is well established that the evaluation of proposals for their technical quality generally requires the special expertise of procurement officials. Reviewing courts therefore give the greatest deference possible to these determinations. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (Protests concerning "the minutiae of the procurement process in such

matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."); see also One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 74 (2013) (observing that "the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations") (quoting Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005)). "[N]aked claims" of disagreement with evaluations, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 384 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004).

Thus, to successfully challenge NASA's determinations regarding the soundness of KBA's proposal, KBA must show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. With these principles in mind, the Court turns to the objections KBA has raised with respect to the agency's evaluation of its proposal under the Management and Technical Approach subfactors.

### A.   NASA's Assignment of a Significant Weakness Concerning KBA's Proposal for Managing the Baseline Work Performed Under the Contract

#### 1.   The Solicitation's Requirements

The Solicitation establishes that the baseline work of the contract would encompass two types of service requests: 1) Baseline Repairs and Replacements ("BRRs"), i.e., "request[s] for work to existing infrastructure that is essential to protect, preserve, or restore Facilities, Systems, Equipment, and Utilities (FSEU)," AR Tab 15 at 13842; and 2) Service Orders ("SOs"), i.e., "request[s] for facilities-related work that is new in nature and not typically essential to protect, preserve, or restore FSEU," id. at 13856. The baseline work was to be compensated under a fixed-price CLIN item. Accordingly, for purposes of contract administration, NASA uses a very complicated system that establishes units of measurement for the tasks that are included as part of the baseline work. Those units of measurement, or "established counts," are "used to represent the number of categorized [BRRs] and [SOs] in a given Government Fiscal Year." Id. at 13845.

Under the Performance Work Statement (at PWS 1.2.1-23), the contractor was required to "[m]anage the established counts of SOs and BRRs with the established counts exchange rate (ECER)" and "[e]xchange the established counts of SOs and BRRs within each customer using the ECER to meet fluctuating needs." Id. at 13723. Offerors were required to supply a description of their "approach to prioritize, schedule, report, and ensure completion of baseline and IDIQ requirements in a multi-user Spaceport environment, including responding to surge requirements and completing the total combined established units for each customer per fiscal year." Id. at 13696. They would also be required to "[d]evelop and direct a monthly, two hour Surveillance Review with the [contracting officer's representative] and other Government representatives to discuss [topics including] established counts status." Id. at 13725. During that meeting, the contractor would secure the approval of the contracting officer's representative for

exchanges between baseline customers, based on review of the established counts status. See id. at 13724–25 (PWS 1.2.3-3).

### 2.   NASA's Evaluation of KBA's Proposal for Managing Established Counts

In the section of its proposal responsive to the foregoing requirements and the corresponding evaluation criteria, KBA stated as follows, in pertinent part:

> We provide near real-time reporting on the Government management portal of the running total of counts by work category and total combined units per customer. We develop a budget management system in Excel that monitors and tracks the expenditure of work units by client. We establish a set point of 85% for each type of work unit by client. Once an 85% spend level is attained, the customer is notified in writing of the potential spending limit infraction and a path forward is developed. We manage and prioritize EWRs to ensure the total combined established units for each baseline customer are not exceeded, and communicate with the Government on recommended approaches (e.g., deferred maintenance (DM), exchanges between customers, IDIQ) to ensure sufficient units are available throughout each fiscal year.

AR Tab 20a at 15635.

The SEB assigned KBA a significant weakness with respect to this aspect of its proposal. It concluded that "KBA's approach of using a set point of 85% to monitor and track the expenditure of 'work units' by customer is an inappropriate approach to managing the established counts of [BRRs] and [SOs]." AR Tab 32a at 27668. The SEB explained that the approach did not "demonstrate how KBA will not exceed the total combined established units," nor did it "demonstrate how KBA will perform PWS 1.2.1-23 requirement to exchange the established counts of BRRs and SOs within each customer using the ECER to meet fluctuating needs." Id. In addition, the SEB found that KBA's "approach of notifying the customers does not meet with PWS 1.2.3-3 requirement to discuss established counts status at the monthly Surveillance Review with the Contracting Officer's Representative." Id.

The SEB found these flaws in KBA's proposal significant because "[m]anaging the established counts [was] a significant portion of the contract," and because, in the SEB's view, KBA "fail[ed] to describe an approach for actively managing the usage rates of the counts until the 85% set point is reached." Id. According to the SEB, this aspect of the proposal "appreciably increase[d] the risk [that] facilities [would] be unavailable and cause budgetary burdens on customers to fund purchases of additional pre-priced counts or deferral of priority work." Id.

KBA now contends (as it did unsuccessfully before GAO) that the agency's assignment of a significant weakness concerning its proposal to manage established counts is based on a misunderstanding of the proposal. Thus, while KBA concedes that the "85% set point notification" does not satisfy the requirement set forth in PWS 1.2.1-23 that the contractor actively manage established counts, it asserts that it was "never intended" to do so. Pl.'s Mem. at 24. Instead, according to KBA, it proposed to manage established counts by "develop[ing] a

budget management system in Excel that monitors and tracks the expenditure of work units by client" and by "communicating with the government regarding needs for approaches to ensure sufficient units are available, such as 'exchanges between customers.'" Id. (citing AR Tab 20a at 15635) (emphasis omitted).

KBA's challenge to this aspect of NASA's evaluation lacks merit. "An offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency." Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 744 (2009) (citation omitted). Further, "all offerors, including incumbents, are expected to demonstrate their capabilities in their proposals." Int'l Resource Recovery, Inc. v. United States, 60 Fed. Cl. 1, 6 (2004). Regardless of what KBA intended to communicate, it was not unreasonable for the agency to have understood that the 85% notification threshold was a central feature of KBA's approach to managing the established counts and that, as such, KBA's proposal did not adequately address this important requirement.

The agency's conclusion was particularly reasonable given the conclusory nature of the other language in KBA's proposal, which asserted (without explaining how) that KBA "manage[s] and prioritize[s] [electronic work requests] to ensure the total combined established units for each baseline customer are not exceeded, and communicate[s] with the Government on recommended approaches . . . to ensure sufficient units are available throughout each fiscal year." AR Tab 20a at 15635. In fact, this portion of KBA's proposal essentially just restates the Solicitation requirements, which offerors were cautioned not to do. See AR Tab 15 at 13695 ("The proposal shall not simply rephrase or restate the Government's requirements, but rather shall provide convincing rationale to address how the Offeror intends to meet the requirements. . . . Information shall be precise, factual, detailed, and complete.").

The Court finds similarly unpersuasive KBA's argument that "NASA evaluators were incorrect in their assertion that KBA's proposal failed to address the monthly surveillance review meeting." Pl.'s Mem. at 24. KBA appears to argue that the evaluators erred by failing to infer that this requirement was satisfied by a separate section of its proposal—which assigned its Program General Manager to participate in the surveillance review meetings. But the SEB's criticism was not directed at whether the appropriate personnel would be participating in the meetings; rather, it was directed at KBA's failure to specify that established counts would be discussed at each meeting. Again, it was KBA's responsibility to submit a well-written proposal that was responsive to the requirements of the Solicitation.

Finally, KBA has challenged the agency's view that its proposal created a risk of imposing "budgetary burdens," contending that budget issues are "not properly considered on a fixed-price contract." Pl.'s Mem. at 25–26. As the government points out, however, KBA misunderstands the nature of the "budgetary" risks the SEB identified. The SEB concluded that KBA's proposed approach could "cause budgetary burdens on customers to fund purchases of additional pre-priced counts or deferral of priority work." AR Tab 32a at 27668. In other words, the risk identified was that additional counts would need to be procured or work deferred because of inadequate management of the established counts. That risk is appropriately a consideration where, as here, the fixed price CLIN covers only a set number of counts. This

challenge to the SEB's decision to assign a significant weakness to KBA's proposal, therefore, falls short.

### B.      Assignment of a Weakness Regarding the Outage Management Process

KBA also challenges the SEB's decision to assign its proposal a weakness based on its conclusion that KBA's proposed "outage management process . . . include[d] cost type contract assumptions," which the SEB believed "demonstrate[d] a lack of understanding of and ability to manage the contract as a fixed-price contract." AR Tab 32a at 27670. According to the SEB, these "cost type" assumptions were reflected in KBA's proposal to assign a budget to each outage, to use an outage cost control coordinator to track, update, and report the cost performance against the outage budget, and to present such reports at the weekly outage meeting. Id. These features of its proposal, according to the SEB, evinced KBA's failure to appreciate that "all outages [would] be accomplished either within the fixed baseline price of the contract or through fixed-price pre-priced [IDIQ] task orders." Id.

KBA asserts that the inferences that the SEB drew from its proposal were unreasonable. It contends that the proposal "clearly indicated that KBA understood that outage management was to be performed under fixed-price baseline or IDIQ work." Pl.'s Mem. at 27. In support of that assertion, it cites several pages in the Technical Approach 1.0 section of its proposal, in which it referenced the concept of "baseline work" or "Baseline Repairs and Replacement" while also discussing outages. Id. But the SEB's concern arose out of KBA's decision to characterize and feature the cost management and control procedures as a "key element" of its Outage Management Process. AR Tab 32a at 27670. The oblique references upon which KBA relies in its motion do not persuade the Court that it was irrational for the SEB to conclude that KBA's proposal betrayed a lack of appreciation of the fixed-price nature of the contract.

The Court is also not persuaded by KBA's argument that that the Solicitation "require[d] that actual costs are tracked in order to actively manage categories of BRRs and SOs that correspond to different cost levels," and that therefore, "KBA's proposal to monitor costs and work scope for outages performed as part of the overall baseline fixed-price effort is consistent with contract requirements." Pl.'s Mem. at 27–28. As the government explains, the cost tracking associated with BRRs and SOs "addresses a separate PWS requirement" from outage management. Def.'s Mot. at 34; Def.'s Reply in Supp. of Mot. for J. on the Admin. R. at 13–14, ECF No. 42.

In short, the Court is satisfied that the SEB examined the proposal in its entirety, applied its expertise to the proposal's interpretation, and supplied an adequate explanation of its reasoning. Its assignment of a weakness to this aspect of KBA's proposal was rational and supported by the record.

### C.      Assignment of a Significant Weakness Concerning Failure to Identify Other Direct Costs in Basis of Estimates

The agency assigned KBA's proposal a significant weakness under the Technical Approach subfactor because its "basis of estimate" ("BOE") spreadsheet "fail[ed] to identify any other direct costs" ("ODCs") for operations, maintenance, and engineering to perform the [PWS]

14

requirements. AR Tab 32a at 27672. KBA challenges this determination on the grounds that the Solicitation did not require it to provide the information omitted from its spreadsheet and that, in any event, the information was included elsewhere in its proposal. These contentions lack merit.

The SEB's decision to assign the significant weakness was based on what it viewed as a failure on KBA's part to comply with Section L.16.2 of the Solicitation. That provision specified the information an offeror was required to include in its proposal in response to the Technical Approach subfactor. It stated that offerors must provide BOEs "for the requirements identified in Attachment L-03 (BOE Template), using the format provided." AR Tab 15 at 13698; see id. at 14984 (BOE Template). It further stated that on the template, offerors were required to include "(a) An itemization of resources (labor and non-labor for the Offeror, including all subcontractors) described in sufficient detail to demonstrate the Offeror's understanding of the requirements and the reasonableness of the proposed approaches"; and "(b) A detailed explanation of methodologies, rationale, and other relevant information to allow the Government to clearly understand the proposed approaches." Id. at 13698. The Solicitation informed potential offerors that NASA would "evaluate the Offeror's Basis of Estimates (BOEs) for demonstration of understanding of the requirements and the reasonableness of the proposed approaches." Id. at 13710.

Based on these instructions, each offeror submitted a completed version of Attachment L-03 with its proposal. It is undisputed, however, that the BOE Template that KBA submitted did not include entries for the two columns covering "other direct costs" to perform the operations, maintenance, and engineering requirements. AR Tab 32a at 27672. The SEB observed that the maintenance function, for example, involved lubrication and the cleaning of equipment, and yet KBA's spreadsheet did not include other direct costs for the materials needed to perform these tasks. Id. Similarly, "the RFP requires a trained, certified, and licensed workforce"; nonetheless KBA did not propose any other direct costs for engineering; nor did it supply a "rationale for how it would obtain the required training, tools or software to provide and maintain an appropriately qualified workforce without requiring ODCs." Id. The SEB concluded that KBA's failure to include ODCs "demonstrate[d] a lack of understanding of the requirements, which appreciably increase[d] the risk of unsuccessful performance." Id.

KBA contends that the Solicitation did not require any itemization of ODCs for the PWS requirements at issue. Pl.'s Mem. at 32–33. Further, it asserts that it "incorporated ODCs into its BOE for these PWS sections," but rather than break them out on the BOE Template, the ODCs "instead were made part of KBA's overall proposed cost." Id. at 33. KBA also contends that the BOE Template did not contain any "substantive instruction" in the "Instruction" and "Legend" included in the attachment. Id. at 34–35; see also AR Tab 15 at 14983 (Instruction and Legend page of Attachment L-03).

The Court finds KBA's arguments unpersuasive. As detailed above, the Solicitation specified that offerors were to provide BOEs for the requirements listed, and that they were to use the format provided in Attachment L-03. AR Tab 15 at 13698. That attachment, in turn, included two ODC columns. Id. at 14984. Further, the Solicitation required offerors' BOEs to include "an itemization of resources . . . described in sufficient detail to demonstrate the Offeror's understanding of the requirements and the reasonableness of the proposed approaches." Id. at 13698 (emphasis supplied). Offerors were further instructed to provide a "detailed

explanation of methodologies, rationale, and other relevant information to allow [NASA] to clearly understand the proposed approaches." Id. And, importantly, offerors were on notice that their BOEs would be evaluated for "demonstration of [their] understanding of the requirements and reasonableness of the proposed approaches." Id. at 13710.

In light of the foregoing, it was reasonable for the agency to assign a significant weakness to this aspect of KBA's proposal, notwithstanding that KBA included ODCs in its "overall proposed cost." The agency instructed offerors to fill out the BOE Template so that it could fully assess their understanding of the contract requirements and the reasonableness of their approaches. The SEB's assignment of the significant weakness based on KBA's failure to sufficiently demonstrate its comprehension was reasonable and consistent with the Solicitation.

The Court also rejects KBA's argument that it was "prohibited" from providing ODCs for the requirement to provide a trained and fully licensed workforce. The fact that the Solicitation required training to be provided at the contractor's expense did not obviate the requirement that offerors list the ODCs of such training to demonstrate to the agency's satisfaction that they understood the training requirement and had a reasonable proposal to meet it.

Once again, it was KBA's responsibility to submit a "well-written proposal with adequately detailed information that allow[ed] for a meaningful review by [NASA]." Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture, 89 Fed. Cl. 735 at 744. Though KBA now maintains that it "incorporated ODCs into its BOE" for the PWS sections at issue, the Solicitation was clear that offerors were required to demonstrate their understanding of the requirements by "showing their work" using the BOE Template to reflect those costs. The Court finds that NASA did not act arbitrarily or unreasonably in assigning a significant weakness for KBA's failure to provide any ODCs for the baseline work requirements listed in Attachment L-03.

**D.     Assignment of a Weakness Concerning the Process for Managing Maintenance Action Requests**

Finally, NASA assigned KBA a weakness under the Technical Approach subfactor based on KBA's failure to meet the PWS 3.1.2-2 requirement to "[d]evelop and maintain a process to manage Maintenance Action Requests (MARs) within Maximo." AR Tab 15 at 13767. Like its other challenges to the SEB's evaluation decisions, KBA's claim that the assignment of this weakness was improper lacks merit.

Maximo is a government-provided computerized maintenance management system that is used at the Kennedy Space Center. Id. at 13745. An MAR is "[t]he authorizing document for adding, changing or deleting items of equipment and maintenance procedures in Maximo in accordance with the Maintenance Plan." Id. at 13852. According to the SEB, KBA's proposal did not explain how it would "develop and maintain a continuous process to manage MARs within Maximo"; it merely stated that it would "review and disposition MARs at the weekly Baseline Work Integration meeting." AR Tab 32a at 27674. Further, the SEB found KBA's proposed approach to managing MARs flawed because it would lead to "an inefficient use of the Government's time at the [weekly] meeting." Id. As a result, the SEB predicted a "risk of

untimely MARs disposition, which increases the risk of schedule disruption and degradation of the systems for which [the contractor] is responsible." Id.

KBA again contends that the SEB misread its proposal. It argues that in addition to providing for review of MARs during the Baseline Work Integration Meeting, other aspects of its proposal included "a continuous process/work flow within Maximo." Pl.'s Mem. at 36. Specifically, KBA notes that its proposal made reference to related software tools and that it stated: "We use EWRS and Maximo so the current work status of all WONs is available on demand." Id. at 37 (citing AR Tab 20a at 15668).

As the government points out, the separate section of the proposal cited by KBA is not responsive to the particular PWS requirement at hand. See Def.'s Mot. at 40 (statements cited by KBA "correspond to the requirements of PWS 2.1.1.2 and 2.1.1.3 which address configuring and utilizing Maximo and EWRS") (citing AR Tab 58a at 28355). Further, the SEB found the proposal's references to MAR processes within Maximo too general to meet the requirement of the Solicitation that it explain how issues would be managed through Maximo. Def.'s Mot. at 39–40. It determined that the proposal's conclusory references to the relevant software programs and its confirmation that "[w]e use EWRS and Maximo" to keep track of work orders did not address the Solicitation's requirement to explain the "continuous process" KBA planned to use to manage MARs within Maximo. The SEB's determination appears reasonable to the Court; accordingly, it declines KBA's invitation to substitute its views for those expressed by the SEB in exercising its expertise and considerable discretion to evaluate the technical merit of KBA's proposal.

The Court also finds rational the SEB's concern that, under KBA's proposal, an excessive amount of time would be spent on MARs at weekly meetings. KBA's proposal specifies that it will maintain an MAR log listing work orders, which in turn is to be reviewed at each weekly Baseline Work Integration Meeting, where "each open action/issue will be reviewed and dispositioned in a number of ways." AR Tab 20a at 15669. The proposal further contemplates that "[d]isposition outcome(s) will be reviewed at the next scheduled meeting with the expectation [that] the action will be positively addressed and closed." Id. In other words, KBA proposed an approach to manage MARs by discussing them at weekly meetings, not through Maximo as the Solicitation required. The contracting officer reasonably concluded that this would result in inefficiencies.[3]

---

[3] KBA urges the Court to disregard the contracting officer's rationale concerning "inefficiencies" found in her statement because it is a "post-hoc statement" which "is not found in the actual evaluation findings [] or the contemporaneous evaluation record." Pl.'s Reply in Supp. of Mot. for J. on the Admin. R. & Resp. to Def.'s & Def.-Intervenor's Cross-Mots. For J. on the Admin. R. ("Pl.'s Reply") at 18 n.16, ECF No. 40. The Court finds that it may properly consider this aspect of the contracting officer's statement because it is "consistent with the [SEB]'s contemporaneous documentation" of its evaluation findings regarding this weakness. PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 127 (2010). This additional "inefficiencies" rationale is "credible and consistent with the underlying evaluation," and thus represents "an expanded explanation" of the agency's evaluation. Sayed Hamid Behbehani & Sons, WLL, B-

In short, the Court cannot second-guess the SEB's conclusion that KBA's proposal did not adequately meet this technical requirement. KBA's challenge to the weakness the SEB assigned regarding this issue is therefore without merit.

## V.   KBA's Argument That the Agency's Competitive Range Determination Was Not Adequately Documented and Placed Undue Reliance on Adjectival Ratings and "Distorted" Numerical Point Scores

In addition to challenging NASA's assignment of weaknesses to aspects of its proposal as discussed above, KBA contends that the competitive range determination itself was arbitrary and capricious. It argues that, in making the determination, the contracting officer "improperly focused almost exclusively on high-level adjectival ratings, the number of assigned Strengths/Weaknesses, and distorted point scores," and further, that she "did not document any meaningful analysis of the evaluation findings or proposal features underlying those high-level findings." Pl.'s Mem. at 8.

As noted above, to prevail in its challenge to the contracting officer's competitive range determination, KBA must establish that it was "clearly unreasonable." For the reasons set forth below, the Court finds that KBA has failed to do so. The reasons for the contracting officer's competitive range determination were fully documented in the record and were not based solely on adjectival ratings and point scores. Instead, the determination reflects a meaningful consideration of all relevant factors. Further, and contrary to KBA's argument, NASA's point-score system did not artificially inflate the evaluated differences between the proposals. Rather, it provided a useful point of reference for distinguishing which proposals were the most highly rated and, therefore, should be included in the competitive range.

### A.   KBA's Argument That the Competitive Range Determination Was Not Adequately Documented

FAR 15.306(c)(1) governs the establishment of the competitive range. It states that "[b]ased on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency." FAR 15.306(c)(1) does not prescribe any documentation requirement or mandatory content for a contracting officer's memorandum memorializing her competitive range determination. Cf. FAR 15.308 (stating that a source selection decision "shall be documented," and that "the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs"). There is thus no legal authority that supports KBA's contention that the Court is precluded from looking beyond the competitive range memorandum itself when reviewing whether the contracting officer's decision to exclude it from the

---

288818.6, 2002 CPD ¶ 163, 2002 WL 31159457, at *4 n.2 ("Where, as here, a post-protest explanation simply fills in previously unrecorded details of contemporaneous conclusions, we will consider it in our review of the rationality of [the] selection decision so long as the explanation is credible and consistent with the contemporaneous record.").

competitive range lacked a rational basis. See Pl.'s Mem. at 14 (arguing that "when making competitive range determinations, agencies are not only required to look behind the point scores and adjectival ratings, but such an analysis must actually be documented in the competitive range determination") (emphasis altered); see also id. at 7. To the contrary, as with other agency procurement decisions, the Court may look to the entire administrative record when assessing whether a competitive range determination was arbitrary, capricious, or an abuse of discretion. See Med. Dev. Int'l, Inc. v. United States, 89 Fed. Cl. 691, 710–11 (2009) (finding a determination adequately documented where the record included "a short summary of the balancing that took place" and noting further that "such balancing is entitled to a presumption of regularity").[4]

Here, the basis for the contracting officer's competitive range determination is well documented in the competitive range memorandum and in the record of the SEB's evaluation of the proposals. Thus, the SEB's presentation of its initial evaluation of each offeror's proposal to the SSA contains an explanation of the strengths and weaknesses the SEB assigned to each offeror's proposal for each technical subfactor under the Mission Suitability factor. These strengths and weaknesses, which were memorialized in individual memoranda, served as the basis for the adjectival ratings and point scores the SEB assigned. AR Tab 38 at 27804–39. The presentation further contains an explanation of the reasoning for the "Very High" confidence rating assigned for each offeror's past performance and includes a summary of the total evaluated price of all offerors. Id. at 27841–48.

In the competitive range memorandum itself, the contracting officer explained that she had decided to place the three most highly scored and rated proposals into the competitive range. That determination was supported by the fact that there was a natural breakpoint between the Mission Suitability scores of the three highest-rated proposals (Offeror A, Offeror B, and PSP) as compared to the remaining two proposals (Offeror C and KBA). See Arsenault Acquisition Corp.; E. Mulberry, LLC, B-276959, 1997 CPD ¶ 74, 1997 WL 577522 (Comp. Gen. Aug. 12, 1997) (upholding establishment of competitive range using "natural breakpoint" among the total scores of the proposals). The contracting officer also took the price of the top three proposals into consideration and concluded that "[d]iscussions would likely enhance all three proposals, thereby increasing competition, which maximizes the Government's ability to obtain the best value." AR Tab 39 at 27916.

---

[4] For this argument and others, KBA relies heavily upon GAO's Pinnacle decision. See, e.g., Pl.'s Mem. at 7, 11, 14–17. The Court is skeptical of Pinnacle's relevance to the instant protest, largely because GAO itself found its own prior decision distinguishable when applied to the facts at issue here. AR Tab 71 at 60125. And in any event, to the extent that Pinnacle is in tension with the Court's findings in the present case, GAO decisions are not binding on this Court, but instead may be used as persuasive authority when appropriate. Univ. Research Co. v. United States, 65 Fed. Cl. 500, 503 (2005). The Court thus rejects KBA's proffer of Pinnacle as authority to support its arguments in this case, particularly the argument that the Court must look exclusively to the competitive range memorandum—and may not review the entire administrative record—to discern the agency's reasoning.

The contracting officer also provided a specific explanation in the memorandum as to why she had found that KBA's proposal was not among the most highly rated. She cited the proposal's several significant weaknesses, which had resulted in it being assigned the second-lowest Mission Suitability score of the five proposals. These included, as described above, "several Basis of Estimate areas that demonstrated a lack of understanding in various resource areas" and an "approach to managing the established counts" that the SEB found inadequate. Id.

The contracting officer also explained that, in her view, it was unlikely that holding discussions with KBA would be fruitful. She observed that even if KBA corrected its weaknesses as a result of discussions, its proposal still would lack any strengths or significant strengths in the Management and Technical subfactors. She predicted that KBA would therefore have to make "significant proposal revisions" in order to increase its Mission Suitability score substantially. Id. Moreover, she reasoned, KBA's evaluated price was the second highest, making the possibility of any tradeoff unlikely. Id.

As the foregoing demonstrates, the record reflects that the contracting officer concluded that KBA's proposal was not among the most highly rated because it was the second highest in price and yet had significant weaknesses and no strengths with respect to the two most important Mission Suitability subfactors. KBA's adjectival ratings and point scores were inferior to those of the three proposals that the contracting officer concluded were the most highly rated, including two proposals that came in at a significantly lower price. The contracting officer's reasoning was adequately documented through the competitive range memorandum and the supporting evaluation materials. Therefore, KBA's contention that the competitive range determination does not reflect a meaningful consideration of relevant factors, lacks merit.

**B.     KBA's Argument That NASA's Point Score System Distorted the Extent of the Qualitative Differences Between the Proposals**

In addition to its argument that the contracting officer did not adequately document the basis for her competitive range determination, KBA challenges as "arbitrary and misleading" the Mission Suitability point-scoring system that NASA employed in connection with its evaluation process. Pl.'s Mem. at 15. KBA contends that a comparison of the total number of strengths and weaknesses assigned to each offeror's proposal does not portend a "large disparity" in the "underlying Mission Suitability evaluations." Id. at 15; see also AR Tab 38 at 27912. The point scores, KBA argues, "distort[ed] and artificially inflate[d] the actual evaluated differences between the offerors' Mission Suitability proposals." Pl.'s Mem. at 15–16.

KBA's "distortion" argument lacks merit. It is premised on the notion that the strengths and weaknesses that the SEB identified in each subfactor were of equal importance in scoring the Mission Suitability factor. In fact, however, each subfactor was assigned a weight based on its importance (525 points for Management Approach, 375 points for Technical Approach, and only 100 points for Small Business Utilization). Strengths and weaknesses assigned under the Management Approach subfactor, therefore, carried more than five times the weight of those assigned under the Small Business Utilization subfactor. And, as the summary chart below shows, KBA lacked any strengths that might outweigh its weaknesses under the two most

20

important subfactors, Management and Technical Approach.[5] When the relative importance of the subfactors is taken into consideration, the differences between the quality of the proposals are substantial.

| Offeror | Management - 525 Points | | | | Technical - 375 Points | | | | Small Business - 100 Points | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Strengths | | Weaknesses | | Strengths | | Weaknesses | | Strengths | | Weaknesses | |
| | Significant | Other | Significant | Other | Significant | Other | Significant | Other | Significant | Other | Significant | Other |
| Offeror A | 0 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |
| Offeror B | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| PSP | 0 | 2 | 0 | 0 | 2 | 1 | 2 | 5 | 1 | 0 | 0 | 0 |
| KBA | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 4 | 1 | 0 | 0 | 0 |
| Offeror C | 0 | 1 | 1 | 1 | 1 | 0 | 2 | 5 | 1 | 0 | 0 | 0 |

| Offeror | Adjectival Rating | Percentile Score | Points | Adjectival Rating | Percentile Score | Points | Adjectival Rating | Percentile Score | Points | Total Points |
|---|---|---|---|---|---|---|---|---|---|---|
| Offeror A | Good | 68 | 357 | Very Good | 86 | 323 | Very Good | 85 | 85 | 765 |
| Offeror B | Good | 59 | 310 | Very Good | 81 | 304 | Good | 70 | 70 | 684 |
| PSP | Good | 69 | 362 | Good | 58 | 218 | Very Good | 82 | 82 | 662 |
| KBA | Fair | 37 | 194 | Fair | 40 | 150 | Very Good | 87 | 87 | 431 |
| Offeror C | Fair | 41 | 215 | Fair | 32 | 120 | Very Good | 83 | 83 | 418 |

The Court finds similarly without merit KBA's contention that the competitive range determination was arbitrary and capricious because there is nothing in the record that explains "how the evaluators arrived at specific point scores within a 'percentile point range'" before multiplying the percentile scores by the number of available points for each subfactor. Pl.'s Mem. at 16. Thus, KBA argues that "the underlying record still does not show . . . how the evaluators determined whether an offeror fell within the low-end, middle, or high-end of a given 'percentile point range.'" Id. at 16–17.

KBA's contention that there is nothing in the record that explains how specific point scores were assigned ignores the government's explanation that the evaluators reached "consensus findings" and assigned adjectival ratings and scores which were "validated" for consistency. See AR Tab 58 at 28321, 28378. Further, while not explicitly stated, the Court can readily infer that the point scores were assigned on the basis of the number and nature of the strengths and weaknesses found in the proposals with respect to each subfactor.

The evidence supporting this inference is reflected in the summary chart above, which shows each offeror's percentile scores and total points for each Mission Suitability subfactor, as well as the offerors' total Mission Suitability scores. Taking the Management Approach subfactor as an example, Offeror A and PSP received almost identical percentile scores of 68 and 69, which is rational considering their identical distribution of two "other" strengths each, with no significant strengths or any weaknesses of either type. In contrast, although it earned the same adjectival rating of "Good," Offeror B received a percentile score approximately ten points lower, which reasonably follows from the fact that it achieved only one strength and was also assigned a weakness. Along the same lines, there is a rational relationship between Offeror A

---

[5] Data in the chart is taken from AR Tab 38 at 27803, 27805, 27807, 27809, 27811, 27813, 27815, 27818, 27820–23, 27825, 27827, 27829, 27831, 27833, 27835–37, 27839–40.

and Offeror B's Technical Approach scores within the "Very Good" range, because Offeror A did slightly better than Offeror B in that it earned a strength whereas Offeror B did not.

The relative scores of KBA and Offeror C similarly reflect a rational scoring scheme. Each of these offerors achieved the same "Fair" rating for Management Approach and Technical Approach, but their percentile scores differed based upon underlying differences in their respective evaluations. Offeror C fared slightly better on the scoring of its Management Approach because it earned a strength under that subfactor and KBA did not. KBA fared better under Technical Approach because Offeror C was assigned two significant weaknesses and five weaknesses under that subfactor, pulling its percentile score down toward the bottom of the "Fair" range.

These types of rational relationships hold across all of the percentile scores within the given adjectival ranges. Proposals evaluated similarly under a given subfactor received similar percentile scores for that subfactor, and where the percentile scores varied, the differences are based on the relative weaknesses and strengths assigned as part of the underlying evaluation.

In sum, while the specific basis for determining the percentile scores is of "less than ideal clarity . . . the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. The Court is satisfied that the point-score system, which was used as a guide to the competitive range determination, did not "distort" or "artificially inflate" the differences among the offerors' proposals.[6]

### C.    KBA's Challenges to the Contracting Officer's Determination Regarding the Relative Quality of the Offerors' Proposals

KBA mounts various challenges to the contracting officer's substantive treatment of the relative qualities of each offeror's proposal. For example, it claims that the competitive range memorandum "merely count[ed] the Weaknesses assigned to KBA's proposal" and failed to acknowledge or discuss the fact that other proposals with the same or similar weaknesses were included in the competitive range. See Pl.'s Mem. at 8–9.

---

[6] In addition to opposing on the merits KBA's argument that the use of point scores artificially distorted and inflated the differences among proposals, the government also contends that— under the reasoning of Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007)—KBA waived that argument by not raising it before the proposals were evaluated. See Def.'s Mot. at 18–19. The Court finds the government's waiver argument unpersuasive. It does not view KBA's challenge as one to the use of the point-score system referenced in the Solicitation; rather, the gist of KBA's argument is that the agency did not provide an adequate explanation in the record as to why it assigned particular point scores within the specified ranges when evaluating the various proposals. KBA also argues that, as applied, the point scores assigned distorted the differences between the proposals. The Court views these as challenges to the evaluation process rather than to a "patent error" in the terms of the Solicitation. See Blue & Gold Fleet, 492 F.3d at 1315.

But the contracting officer did not merely count weaknesses; she considered the relative importance of the weaknesses assigned to each offeror's proposal and weighed them against their strengths. KBA's proposals were not comparable to those it cites, for the proposals of the other offerors that had similar weaknesses were also assigned strengths and/or significant strengths under the Management and Technical Approach subfactors. KBA's proposal, on the other hand, was assigned only the weaknesses, and no strengths.

The evaluation scheme required NASA to balance each proposal's strengths and weaknesses to determine its adjectival rating. See, e.g., AR Tab 38 at 27802 ("Fair" rating, for example, indicates that a proposal's "[w]eaknesses outbalance any strengths") (emphasis supplied). Because KBA's weaknesses in the two most important subfactors were not counterbalanced by any strengths or significant strengths—as noted in the competitive range memorandum—it was reasonable for NASA to base its exclusion of KBA from the competitive range in part on these weaknesses, as well as on the "Fair" ratings assigned to KBA's proposal as a result of the imbalance.

KBA also alleges that in determining the competitive range, NASA gave short shrift to its high ratings and strong showing under the Small Business Utilization subfactor within the Mission Suitability evaluation. Pl.'s Mem. at 9–12. KBA argues that "[h]ad NASA's competitive range determination actually looked behind the offerors' adjectival ratings under the Small Business Utilization plan subfactor and actually documented a reasoned consideration of the actual evaluation findings, KBA's Small Business Utilization plan clearly would have been deemed to be superior to the other offerors' plans." Id. at 10 (emphasis removed).

But NASA in fact did deem KBA's small business plan superior; it assigned KBA the highest score of 87 out of 100 for the Small Business Utilization subfactor. AR Tab 38 at 27840. The fact remains, however, that this subfactor was by far the least important of the three subfactors, for the maximum number of points available under it was 100, as compared to the 525 and 375 points available for the Management and Technical Approach subfactors, respectively. Even if KBA had been assigned the maximum Small Business Utilization score of 100 points, its overall total Mission Suitability score would have increased only from 431 to 444, leaving it well below PSP's score of 662, the lowest Mission Suitability score among competitive-range offerors.

KBA's challenges to the contracting officer's analysis of the Past Performance factor are similarly unpersuasive. As explained above, all proposals were assigned a "Very High" confidence rating under this factor. KBA contends that the contracting officer should have treated its proposal as superior to the others with respect to past performance. It contends that "a reasonable evaluation of KBA's 'exceptional' and 'very highly pertinent' past performance on the incumbent contract would have given KBA an edge over the other offerors who, although similarly rated, did not have this unique type of highly relevant experience." Pl.'s Mem. at 12–13.

The record shows that—contrary to KBA's argument—the agency engaged in a meaningful evaluation of each offeror's past performance under the criteria set forth in the Solicitation. See generally AR Tabs 32b, 33b, 34b, 35b, 36b (detailed SEB analysis and findings as to past performance of each offeror); see also AR Tab 38 at 27844–48 (SEB presentation

slides summarizing past performance evaluations); id. at 27878–900 (SEB presentation Past Performance back-up slides). Further, KBA received credit for the exceptional performance of joint venturer YEI on the predecessor contract. See AR Tab 32 at 27683–90.[7] At the same time, KBA actually fared slightly worse than the other four offerors when all of the contracts submitted for the Past Performance evaluation are taken into account. KBA demonstrated "significantly relevant" experience across four out of five PWS areas and "relevant" experience on the fifth, whereas the other four offerors all demonstrated "significantly relevant" experience on each of the five areas. Compare AR Tab 38 at 27847 (summary of KBA's past performance evaluation) with id. at 27844–46, 27848 (summaries of other offerors' past performance evaluations). Thus, KBA's argument that the contracting officer was required to give it an edge in terms of its Past Performance rating based on YEI's work on the predecessor contract lacks merit.

### D.    KBA's Contention That NASA Did Not Meaningfully Consider Price When Determining the Competitive Range

Finally, KBA asserts that the competitive range determination "does not document a meaningful consideration of price." Pl.'s Mem. at 18 (emphasis omitted). More specifically, KBA posits that the competitive range determination did not "document any sort of comparison of the offerors' prices to the Independent Government Cost Estimate," nor did it "probe the underlying reasons" for the disparity between KBA and Offeror A's prices—$658.3 million and $670.0 million, respectively—and the other three offerors' prices, all of which were below $490 million. Pl.'s Mem. at 18–19 (emphasis removed); AR Tab 38 at 27851 (table showing each offeror's total evaluated price).

KBA's argument that the agency did not document a comparison of the offerors' prices is inconsistent with the administrative record. The underlying SEB presentation explicitly reflects that—consistent with the criteria set forth in the Solicitation—the SEB "perform[ed] a price analysis in accordance with FAR 15.404-1(b)." AR Tab 15 at 13711 (Solicitation); AR Tab 38 at 27850 (SEB presentation).[8] The SEB presentation includes a calculation and comparison of the total evaluated price for each proposal, which included baseline annual services (CLIN 001 & 003), baseline established counts (CLIN 002 & 004), government-provided values (CLIN 005), estimated IDIQ price (CLIN 006 & 007), and phase-in costs. AR Tab 38 at 27850–51. The presentation reflects a comparison between each proposal's total evaluated price and the

---

[7] For example, the SEB observed that YEI was a "major" subcontractor on the predecessor contract and that, for the fifth PWS area (Logistics), YEI's performance on that contract "mitigat[ed] the lack of relevant experience on the other cited contracts." AR Tab 32 at 27688.

[8] That provision states that in most situations "[c]omparison of proposed prices received in response to [a] solicitation" is a satisfactory price analysis technique because "[n]ormally, adequate price competition establishes a fair and reasonable price." FAR 15.404-1(b)(2)(i) (citing FAR 15.403-1(c)(1)(i)).

Independent Government Cost Estimate. Id. at 27851. The SEB also evaluated the proposals for unbalanced pricing and found none. AR Tab 65a at 59955.

KBA's argument that NASA should have "probe[d] the underlying reasons" for the price differences between the higher- and lower-priced proposals also lacks merit. The reasons for the price differences would only be relevant if the Solicitation called for a price realism analysis. "Where an award of a fixed-price contract is contemplated, a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk of loss on the contractor." NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015) (internal quotation marks and citation omitted). Accordingly, "for a price realism analysis to apply in a fixed-price contract, the solicitation must expressly or implicitly require a price realism analysis for a proposal to be rejected for an unrealistically low price." Id. (citation omitted).

Further, as explained above, the contracting officer explicitly noted KBA's high price (coupled with its relatively low Mission Suitability score) in explaining why its proposal was not included in the competitive range. Although Offeror A's proposed price was slightly higher than KBA's price, Offeror A's proposal also contained several strengths (unlike KBA's), and Offeror A achieved ratings of "Good" and "Very Good" for two Mission Suitability subfactors under which KBA achieved a rating of only "Fair." The record therefore shows that price was considered as one of the factors relevant to the determination of which proposals were the most highly rated.

*     *     *

In summary, the record reveals that the contracting officer considered all of the evaluation criteria, including price, and weighed the proposals holistically in determining which to include in the competitive range. She did not rely exclusively on adjectival ratings and numerical scores, but rather used them as points of reference or guides in making comparisons among the offerors. Accordingly, the Court rejects KBA's argument that the record does not reflect that the contracting officer engaged in a meaningful analysis of all relevant factors in making her competitive range determination.

## CONCLUSION

For the reasons discussed above, KBA's motion for judgment on the administrative record is **DENIED**, and the government and PSP's cross-motions for judgment on the administrative record are **GRANTED**. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge